IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Norman Sempirek,

    Plaintiff,

v.

State Farm Mutual Automobile
Insurance Company,

    Defendant.

Case No: 2:21-cv-1161

Judge Graham

Magistrate Judge Jolson

## Opinion and Order

    Plaintiff Norman Sempirek suffered injuries as a passenger in an automobile accident. He carried motorist insurance with defendant State Farm Mutual Automobile Insurance Company. His policy had coverage up to $100,000 for bodily injury caused by an uninsured motorist. State Farm and Sempirek, who was not represented by legal counsel, settled for $80,000, with the understanding that State Farm would cover additional amounts (up to the policy limit) on an anticipated Medicare lien. State Farm did so, and the final amount paid was $87,409.

    Sempirek filed this suit to recover the remainder of the policy limit and to assert a claim for breach of the duty of good faith and fair dealing. State Farm has since paid the amount remaining under the policy limit, resolving the first cause of action. This matter is now before the court on the parties' cross-motions for summary judgment on plaintiff's bad faith claim. For the reasons set forth below, the Court grants summary judgment to State Farm.

**I.    Background**

    **A.    The Accident**

    Norman Sempirek and his wife Veronica reside in a small eastern Ohio town named Dillonvale. They were 83 and 82 years old, respectively, at the time of the accident.

    Veronica was driving their Honda Accord on July 8, 2019 as she and Norman returned from a trip to Ohio's Amish country. She arrived at a T-intersection and stopped at a stop sign. She intended to turn left onto a state route which had two lanes of cross-traffic which did not have to stop or yield at the intersection.

1

It is undisputed that Veronica (driving "Unit 1" in the diagram below) pulled out in front of a pickup truck (Unit 2) going about 50 miles per hour (in a 55 mph zone) and traveling in the same direction as she wanted to turn. The pickup truck hit the front passenger side of the Sempireks' car. The collision sent the Sempireks' car into the path of another pickup truck (Unit 3), traveling in the opposite direction at about 35 miles per hour. They sustained a second collision to the passenger side of their car. The front of their car then hit a guardrail and they came to a stop. The State Highway Patrol officer who reported to the scene prepared the following diagram of the accident:



*See* Doc. 33-1. Veronica was cited for failing to yield. *See id.*

The passenger door of the Sempireks' car had to be cut off in order for responders to remove Norman. *See id.* He reported having neck and shoulder pain and was taken by ambulance to a community hospital in Cadiz, Ohio. *See id.*; N. Sempirek Dep. at 27, 38. Because Norman had a hairline cervical fracture in his neck which required care beyond the scope of what the Cadiz hospital could offer, Norman was transported by ambulance to a hospital in Pittsburgh, Pennsylvania. *See* N. Sempirek Dep. at 39; V. Sempirek Dep. at 34; Doc. 39-1.

Norman stayed at the hospital in Pittsburgh for two-and-a-half weeks. *See* N. Sempirek Dep. at 39. He received non-surgical treatment to the fracture in his neck. This included wearing a hard collar and physical therapy. *See id.* at 39–40. Norman was then discharged to a nursing and rehabilitation facility near Adena, Ohio. He stayed at that facility for one month and underwent physical therapy. *See id.* at 28. He was discharged on or about August 24, 2019. In his final several days at the facility, he denied being in pain. *See* Doc. 39-1 at PAGEID 648.

Norman continued to wear a neck collar at home for about a week. *See* N. Sempirek Dep. at 41. After a month or two, his neck was largely back to normal, except that it made a clicking sound every once in a while when he turned it a certain way. *See id.* at 43; V. Sempirek Dep. at 36. Norman experienced lower back pain, for which his doctor prescribed pain medication. *See* N. Sempirek Dep. at 42; V. Sempirek Dep. at 38. He continues to experience lower back pain, which limits his ability to lift objects, mow the lawn, and get up from off the floor. *See* N. Sempirek Dep. at 17, 45–46; V. Sempirek Dep. at 36–37 (testifying that her husband still has backaches, but "[i]f he's not overdoing it, he's pretty good").

### B. The Insurance Claim Process

The Sempireks had an automobile insurance policy with State Farm. It was established (and not disputed here) that Veronica was at fault. *See* Compl., ¶¶ 3, 4 (conceding Veronica's negligence). Because the policy had a household exclusion provision which excluded direct coverage if an insured was injured by another insured under the same policy, State Farm handled Norman's claim as one under the Uninsured Motor Vehicle provision. *See* Pfettscher Dep. at 102. The policy's uninsured motor vehicle coverage had a bodily injury limit of $100,000. *See* Doc. 33-2 at PAGEID 192. The policy separately provided for Medical Payments Coverage (MPC) up to $5,000 per person. *See id.*

The Uninsured Motor Vehicle provision states that State Farm "will pay compensatory damages for bodily injury an insured is legally entitled to recover from an uninsured motorist." Doc. 33-2 at PAGEID 170 (emphasis removed). It further contains a clause entitled, "Deciding Fault and Amount." *Id.* This clause provides that State Farm and the insured must "agree" to two questions: (1) "Is the insured legally entitled to recover compensatory damages from the uninsured motorist?"; and (2) if so, "then what is the amount" of the damages. *Id.* (emphasis removed). If "there is no agreement" between State Farm and the insured as to both questions, then the insured has a right to file a lawsuit. *Id.* There was never any dispute here that the answer to the first question was "Yes."

On July 15, 2019, State Farm opened claims for both Norman and Veronica. *See* Doc. 33-4 at PAGEID 359. State Farm sent several letters to the Sempireks in the following weeks regarding their claims. *See* Doc. 33-3 at PAGEID 239–258. State Farm claims specialist Jonathon Pfettscher attempted to reach Norman by telephone and by letter to gather information for his claim. *See* Doc. 33-33 at PAGEID 237–38; Doc. 33-4 at PAGEID 333, 336–37. The Sempireks admit that they were slow to communicate with State Farm because they were focused on Norman's recovery. *See* Doc. 33 at PAGEID 129. In addition, on State Farm's end, there was a change-over in the agent handling the claim. *See* Pfettscher Dep. at 30–31.

3

On October 14, 2019, Pfettscher spoke with Veronica by phone and they discussed Norman's injuries, his medical bills and how State Farm would provide coverage. *See* Doc. 33-4 at PAGEID 332. It would be Veronica's practice to speak with Pfettscher herself and take care of handling insurance matters on Norman's behalf. *See* V. Sempirek Dep. at 20; N. Sempirek Dep. at 52–53, 57–58 (testifying that Veronica had his approval to speak and act on his behalf); Pfettscher Dep. at 62, 64.

Over the weeks which followed, Veronica submitted medical information, including explanations of benefits, relating to Norman's injuries. *See* Doc. 33-4 at PAGEID 326–31. From November 2019 to January 2020, State Farm reviewed and paid certain medical bills that had been received. *See id.* at PAGEID 320–27. State Farm paid those out of the MPC. *See id.* at PAGEID 311 (indicating that State Farm had paid $1,151 in bills).

Pfettscher continued to monitor the claim file for additional activity. *See id.* at PAGEID at 312–19. After a period in which no additional records or bills had been received, Pfettscher called the Sempireks on April 22, 2020 and spoke with Veronica. She reported that Norman was "doing very well" and was close to being in pre-accident condition. *Id.* at PAGEID 311. She also said that Norman was seeing his primary care physician for regular visits, but had no ongoing treatment relating to his accident injuries. *See id.*; Pfettscher Dep. at 45.

In light of Veronica's statements that Norman was not receiving any further treatment and that his condition was stable, Pfettscher believed it would be a good time to discuss moving forward with evaluating the UM claim. *See* Pfettscher Dep. at 45, 53 (testifying that State Farm preferred to wait until the insured reached "maximum medical improvement" before evaluating a bodily injury claim). Veronica wanted to do so. *See id.* at 45.

Pfettscher explained that they had two options. One would be for State Farm to wait to pay out the claim until it had notice of what the final Medicare lien amount would be. This option could involve waiting six months or more. *See id.* at 48. The second option would be for State Farm to evaluate and pay out the claim without the final Medicare lien, but to consider what the lien amount might be based on information they could obtain from the medical bills and explanations of benefits. *See id.* at 47–48, 58; Doc. 33-4 at PAGEID 310. Veronica said that she would like to move ahead with the claim without the final lien. *See* Pfettscher Dep. at 46, 49, 83.

Pfettscher then performed his evaluation of the claim. Based on medical bills that had already been negotiated and paid by the Sempireks' healthcare insurer, he determined that the Medicare lien would be at least $16,763. *See id.* at 47. He believed that the final lien amount would

4

not exceed another $16,700.  *See id.* at 50.  He also knew that $3,849 remained in the MPC to apply to Medicare liens.  *See id.* at 48.

Separately, Pfettscher factored in a lost wage component of about $5,000.  *See id.* at 56–57; N. Sempirek Dep. at 14 (testifying that he earned $4,000 to $6,000 per year working as an attendant at a funeral home).

The remaining component of the claim was pain and suffering.  Pfettscher describes this as a "gray" area where the industry practice is to set a fair value range, at least when part of the range is below the policy limit.  Pfettscher Dep. at 67.  Claims specialists are given discretion to set the initial range or reserve, but they must do so using State Farm's policies and procedures.  *See id.* at 40–41.  They consider "[l]iability, [the type and severity of the] injury, length of treatment, type of treatment, duration of treatment," as well as the insured's age, "time off work," the "amount of recovery," "lingering effects," and the effect on "daily living."  *Id.* at 40, 55, 62–63.  Claims specialists also speak directly with insureds to get a personal sense or impression of their emotional state relating to their injuries and to gather information about limitations or recovery which may not be reflected in the medical records.  *See id.* at 63–64 (testifying that he had to gather such information from Veronica).

After considering the applicable factors, Pfettscher determined an initial range for pain and suffering of $45,000 to $60,000.  *See* Doc. 33-4 at PAGEID 309.  When adding the other components (Medicare lien and lost wages), Pfettscher set an initial claim value range of $68,800 to $92,000.  *See id.* at 310.

Per State Farm's procedures, Pfettscher's initial evaluation was reviewed by a supervisor.  *See* Pfettscher Dep. at 54.  The supervisor believed that the pain and suffering range was low for a fractured neck which involved a hospital stay and physical therapy.  *See* Doc. 33-4 at PAGEID 309.  The supervisor increased the pain and suffering range to $50,000 to $70,000, which resulted in a revised claim value range of $73,800 to $100,000.  *See id.*; Pfettscher Dep. at 55.

Pfettscher spoke with Veronica on April 28, 2020 to discuss a settlement of Norman's UM claim.  *See* Doc. 33-4 at PAGEID 308.  He began with an offer of $74,000, which he said included payment for the known Medicare lien amount of $16,763.  He explained that additional Medicare lien amounts were not built into the settlement amount.  Instead, State Farm would first pay additional amounts out of the MPC and then out of UM coverage up to the policy limit.  *See* Doc. 33-4 at PAGEID 308.

According to Pfettscher, "[i]t's typically understood within the claims field that if you have a settlement range, you would start your offer on the low end." Pfettscher Dep. at 71. The expectation among claims specialists is that the insured would ask for a higher amount and they would "work towards the middle." *Id.* at 73; *see also id.* at 84–85 (testifying that 95% of customers attempt to negotiate). While on the phone with Veronica, Pfettscher could tell that she was not going to attempt to negotiate, so he voluntarily raised State farm's offer to $80,000 because he thought it was the right thing to do and to show her that the "number was not static, that I could move a little bit." *Id.* at 73–74; *see also id.* at 76 ("I made a move to show her that, yes, we have some room to work with"). Veronica did not ask for any additional money. *See id.* at 77, 85. She told Pfettscher that she would discuss the settlement offer with Norman and call back. *See* Doc. 33-4 at PAGEID 308.

On May 7, 2020, Veronica called back and left a voicemail, which Pfettscher returned on the same day. *See id.* at PAGEID 307; Pfettscher Dep. at 65. She had a concern about an ambulance bill which she had sent in to State Farm. Pfettscher explained that State Farm had already paid it out of the MPC. *See* Doc. 33-4 at PAGEID 307; Pfettscher Dep. at 65. They continued to talk about the medical bills and expected Medicare lien. He "explained the settlement numbers in detail" and went over with her again how they were approaching the lien. Pfettscher Dep. at 65; Doc. 33-4 at PAGEID 307. This included an explanation that the final lien amount was not known and that $16,763 of the settlement money was meant to be put towards the known lien amount. Pfettscher advised Veronica to set $16,763 of the settlement money aside. He said that it would be the Sempireks' responsibility to pay the lien, and he explained to her how to do so. *See* Pfettscher Dep. at 86, 92, 96–97. Pfettscher stated that if additional medical bills (not already covered by the settlement) were received, State Farm would review them for payment, up to the policy limit. *See id.* at 86, 89; Doc. 33-4 at PAGEID 307.

Veronica wanted to accept State Farm's offer of $80,000, but Pfettscher said that he needed to speak with Norman, the named insured. *See* Pfettscher Dep. at 65, 85 (testifying that Veronica likely stayed on the phone line while he spoke with Norman). Pfettscher went over with Norman the factors he considered in arriving at the $80,000 settlement offer, including the nature of Norman's injuries and treatment, his loss of work, the medical bills, and pain and suffering. *See id.* at 66. Norman agreed to the $80,000 settlement offer. *See id.*; Doc. 33-4 at PAGEID 307.

In her deposition, Veronica testified that she thought the settlement was "reasonable" and "a good deal." V. Sempirek Dep. at 23, 43. She had some confusion over how Medicare liens worked,

6

but when she received a bill for a Medicare lien in the amount of $16,763, she remembered that Pfettscher had explained that she needed to pay it, and she did so. *See id.* at 23, 43–45. When asked for her opinion of how Pfettscher treated her, Veronica replied that he was "very nice" and that he explained things to her. *Id.* at 46. She did not feel that he tried to defraud them, and she had no criticism of how Pfettscher handled the claim. *See id.* at 47. Norman too was confused by the medical billing aspect of the process, but he was agreeable to the offer because Veronica was fine with accepting it. *See* N. Sempirek Dep. at 57–58. Norman had no criticism of the way State Farm handled his claim.[1] *See id.* at 59–60.

Following the telephone conversation on May 7, Pfettscher sent the Sempireks a letter and a check in the amount of $80,000 as "full and final payment." Doc. 33-3 at PAGEID 208. The letter added that State Farm would review for payment any medical bills for services not included in the settlement. *See id.*

In July and August of 2020, Veronica paid the $16,763 lien and additional medical bills were processed. *See* Doc. 33-4 at PAGEID 302–04. State Farm directly paid an additional lien in the amount of $11,258. Of that payment by State Farm, $3,849 came from the MPC and $7,409 came from the UM coverage. *See id.* at PAGEID 303. Thus, the final medical lien amount was $28,021, of which the Sempireks paid $16,763 out of the settlement and State Farm paid $11,258 directly.

In total, State Farm paid $87,409 under the UM coverage and $5,000 under the MPC.

C.     **The Filing of this Lawsuit**

Plaintiff originally filed this action in state court. Defendant removed on the basis of diversity jurisdiction. *See* 28 U.S.C. § 1332.

The complaint asserts claims for breach of contract and breach of the duty of good faith and fair dealing. The complaint alleges that Norman is entitled to the remainder of the $100,000 in UM coverage. It further alleges that State Farm acted in bad faith by refusing to "promptly, fairly and in good faith adjust, evaluate and pay" the UM claim. Compl., ¶ 18. The complaint additionally seeks punitive damages and an award of attorneys' fees.

---

[1] In addition to testifying that they had no reason to criticize how State Farm handled the claim, both Veronica and Norman testified that they were unaware this lawsuit had been filed. They expressed a measure of surprise upon being told that it had been. *See* N. Sempirek Dep. at 65 (when asked if he understood that he had a case pending against State Farm, responding, "Why would I have a case against them?"); V. Sempirek Dep. at 19 (responding, "We're suing them? For what?").

In May 2022, the parties entered into a stipulation of partial dismissal. *See* Doc. 30. State Farm agreed to pay plaintiff $12,591 (which exhausted the $100,000 limit), and plaintiff dismissed his breach of contract claim.

This matter is now before the Court on the parties' cross-motions for summary judgment on the remaining claim of bad faith. State Farm has also moved to exclude the opinion of plaintiff's expert from the Court's consideration of the summary judgment motions.

**II.     Standard of Review**

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

8

475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

### III. Discussion

#### A. An Insurer's Duty to Act in Good Faith

Under Ohio law, "an insurer owes a duty of good faith to its insured in the processing, payment, satisfaction, and settlement of the insured's claims." *Tokles & Son, Inc. v. Midwestern Indemn. Co.*, 65 Ohio St. 3d 621, 629, 605 N.E.2d 936, 942 (Ohio 1992). The rationale for imposing an implied duty of good faith includes the related concerns that "the insured usually has no voice in the preparation of the insurance policy," that a "great disparity" exists "between the economic positions of the parties to a contract of insurance," and that "at the time an insured party makes a claim[,] he may be in dire financial straits and therefore may be especially vulnerable to oppressive tactics by an insurer seeking a settlement or a release." *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St. 3d 272, 275, 452 N.E.2d 1315, 1319 (Ohio 1983) (internal quotation marks omitted).

The duty of good faith requires that an insurer "assess claims after an appropriate and careful investigation" and reach conclusions after "the weighing of probabilities in a fair and honest way." *Motorists Mut. Ins. Co. v. Said*, 63 Ohio St.3d 690, 590 N.E.2d 1228 (Ohio 1992), *overruled on other grounds*, *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 644 N.E.2d 397 (Ohio 1994).

It takes more than an erroneous denial of a claim to constitute bad faith. *Dakota Girls, LLC v. Philadelphia Indem. Ins. Co.*, 17 F.4th 645, 653 (6th Cir. 2021) (citing Ohio case law). "An insured must prove that the insurer's refusal to pay a claim was totally arbitrary and capricious and without reasonable justification." *Spremulli's Am. Serv. v. Cincinnati Ins. Co.*, 91 Ohio App.3d 317, 322, 632 N.E.2d 599, 601 (Ohio Ct. App. 1992); *see also Zoppo*, 71 Ohio St.3d at 554, 644 N.E.2d at 400. An insured may prove bad faith by demonstrating the insurer's "dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St. 3d 272, 276, 452 N.E.2d 1315, 1320 (Ohio 1983).

An insurer is entitled to summary judgment on a bad faith claim when a court finds "after viewing the evidence in a light most favorable to the insured, that the claim was fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that

gave rise to the claim." *Tokles*, 65 Ohio St.3d at 630, 605 N.E.2d at 943; *accord Carpenter v. Liberty Ins. Corp.*, 850 Fed. App'x 351, 356 (6th Cir. 2021). Thus, an insurer does not breach the duty of good faith when it refuses a claim which is "fairly debatable" and "the insurer's refusal is based on a genuine dispute over either the facts giving rise to the claim or the status of the law at the time the claim was denied." *Dorsey v. Campbell Hauling*, 2003-Ohio-3341, ¶ 19 (Ohio Ct. App. June 26, 2003); *accord Avery v. Erie Ins. Co.*, No. 1:17-CV-562, 2018 WL 2100371, at *6 (S.D. Ohio May 7, 2018).

### B. Plaintiff's Theory of Breach and Plaintiff's Expert Report

Plaintiff asserts that State Farm breached its duty of good faith by failing to pay Norman the full policy limit of $100,000. In plaintiff's view, the value of the UM claim was "well in excess" of $100,000, and State Farm should not have been considering any payment less than the limit. Doc. 33 at PAGEID 129. Plaintiff contends that State Farm knew that the claim was worth more than the policy limit, but, in an effort to save itself money, took advantage of the Sempireks, who were "elderly" and confused. *Id.*; Doc. 38 at PAGEID 576.

Plaintiff has submitted an expert report from Stuart Setcavage. *See* Doc. 33-9. Setcavage has over 30 years of experience in the automobile insurance claims business. He currently operates his own firm, which offers insurance consulting and claims investigation services. Setcavage states that he has extensive training and experience in the handling of automobile insurance claims.

In his report, Setcavage opines that Norman's claim "clearly had a value in excess of the policy limits and State Farm knew it." *Id.* at PAGEID 436. Setcavage believed that State Farm knew of the claim's true value because of the amount of the medical bills and the nature of accident. *Id.* In his view, State Farm "had no reasonable basis to conclude that this claim was worth less than policy limits." *Id.* at PAGEID 432.

Setcavage calls State Farm's actions "a clear attempt to take advantage of an unsuspecting elderly insured" by "paying less than what was clearly owed." *Id.* at PAGEID 432. He believes that the Sempireks were confused over how State Farm explained the Medicare lien situation. *See id.*

In his report, Setcavage concludes that State Farm had a contractual duty to pay the full value of the claim and that State Farm unreasonably refused to pay Norman all that he was entitled to recover. *See id.* at PAGEID 437–38.

### C. State Farm's Motion to Exclude the Expert Report from Consideration

The trial court serves as a gatekeeper to ensure that expert testimony is both reliable and relevant. Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held that the trial court must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. This gatekeeping obligation applies to all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

An expert opinion must be grounded in a reliable method and procedure. It must be "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. The "[p]roposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Id.*

Rule 702 additionally requires that the testimony assist the trier of fact "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The issue of "fit" is "not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S at 591.

In the context of bad faith claims against insurance companies, an expert may testify about the existence of industry practices and standards. He may also testify about whether an insurance company deviated from industry standards in its handling of a claim. But he may not speculate on the company's motive, nor may he render an opinion on the ultimate issue of whether the company acted in bad faith. *See Foster v. Am. Fire & Cas. Co.*, No. CV 13-426-GFVT, 2016 WL 10409464, at *2 (E.D. Ky. Nov. 17, 2016) (citing cases); *Chaney v. State Farm Mut. Auto. Ins. Co.*, No. 614CV1043ORL41DAB, 2015 WL 12838839, at *5 (M.D. Fla. Dec. 9, 2015) (citing cases).

### 1. Opinion about the Value of the Claim

State Farm does not challenge Setcavage's credentials as an expert on the claims-handling process. It does not dispute his statement that the industry standard is for an automobile insurance company, upon notification of a claim by its insured, to "promptly, thoroughly and fairly

investigate" the claim. Doc. 33-9 at PAGEID 428. Nor does State Farm disagree with Setcavage's statement that if a covered loss has occurred, then an insurance company should fairly and thoroughly evaluate the value of the claim and timely issue payment up to the coverage limits.

However, State Farm does argue that certain portions of Setcavage's Report should be excluded from consideration at the summary judgment stage. State Farm primarily objects to his opinion about the value of plaintiff's claim for UM coverage. Setcavage opines that the claim's value was so clearly in excess of the policy limits that State Farm should have paid it in full. State Farm argues that Setcavage's opinion is unreliable because it is without a sufficient foundation.

"An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000). "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). *See also Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 679 (6th Cir. 2011) (excluding expert opinion which was based on "pure conjecture").

Excluding expert testimony is not a measure for a court to take lightly. If there are mere inconsistencies in the factual record, such that the factual basis of an expert witness' opinion is weak, this bears "on the weight of the evidence rather than on its admissibility." *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir.1993). Nonetheless, expert testimony should serve "as a guide to interpreting [the] facts . . . not a substitute for them." *Brooke Grp.*, 509 U.S. at 242. *See also Davison v. Cole Sewell Corp.*, 231 Fed. App'x 444, 449 (6th Cir. 2007) (excluding expert opinion that "lacked a reliable foundation"); *Shaw v. Strackhouse*, 920 F.2d 1135, 1142 (3d Cir. 1990) (excluding expert opinion based on assumptions having "no support in the record.").

Setcavage states that plaintiff's claim "clearly had a value in excess of the policy limits." Doc. 33-9 at PAGEID 436. Setcavage does not directly explain how he arrived at that determination, but he does make reference to the crash being "severe"; to Norman needing to be "life-flighted" to Pittsburgh; to Norman needing "extended hospitalization and then nursing home care"; and to the medical bills alone exceeding the policy limits. *Id.* at PAGEID 426, 436.

State Farm argues that plaintiff has failed to establish a foundation for Setcavage's valuation of plaintiff's claim. The Court agrees. Two of the considerations cited by Setcavage are not supported by the factual record. First, there is no evidence that Norman was in such a condition that he had to be life-flighted to Pittsburgh. In stating his belief that Norman was life-flighted,

Setcavage cites a letter which plaintiff's counsel wrote to State Farm before filing suit. *Id.* at PAGEID 433 (citing SF 000955–57, *located at* Doc. 33-3 at PAGEID 287–289). Counsel's letter is not evidence of what occurred to Norman. The record instead is uncontroverted that Norman was discharged in "stable condition" from Harrison Community Hospital and then transported by ambulance to a hospital in Pittsburgh so that he could receive non-surgical treatment for the hairline fracture in his neck. *See* Doc. 39-1; N. Sempirek Dep. at 39–40; V. Sempirek Dep. at 34.

As Setcavage confirmed in his deposition, the assumption that Norman was life-flighted was crucial to his evaluation of the claim. Setcavage was asked several times why he thought the claim's value exceeded $100,000, and each time he pointed to Norman being life-flighted as a chief reason. *See* Setcavage Dep. at 64–65, 71–72. Setcavage explained that when someone is in "horrific car crash" which requires them to be "life-flighted," such a case will not settle for less than $100,000. *Id.* at 64. Setcavage thought any injuries requiring that a person be life-flighted would "have a drastic effect on [the victim's] quality of life," particularly in light of Norman's age. *Id.* at 64–65 (further saying that no one is going to be life-flighted and just "walk[] away from that with no injuries"). Setcavage added that whenever an accident victim "require[s] life-flighting to Pittsburgh for trauma care," the valuation is necessarily going to exceed $100,000. *Id.* at 72.

The second consideration cited by Setcavage which is not supported by the factual record is the amount of Norman's medical bills. The record contains no evidence supporting Setcavage's assumption that the medical bills alone exceeded the policy limits. Setcavage appears to have taken this "fact" from the complaint, which alleged that Norman incurred medical bills in excess of $300,000. *See* Doc. 1, ¶ 7. The record does not support plaintiff's allegation. The only evidence submitted on this matter is that the medical bills covered by State Farm totaled $29,171.49. *See* Doc. 33-4 at PAGEID 303 (showing a Medicare lien amount of $28,020.63, not counting $1,150.86 which State Farm had already paid out of the MPC). As Pfettscher testified, there is a difference between the gross medical bills and the much lesser amounts which Medicare negotiates with the provider to be final payment in full. The negotiated final amounts are what is relevant to claim valuation. *See* Pfettscher Dep. at 57.

Setcavage's opinion about the value of the claim does not withstand scrutiny, even putting aside his unsupported factual assumptions about Norman being life-flighted and the amount of the medical bills. Where non-scientific expert testimony is involved and the expert purports to rely on his own experience in rendering an opinion, the district court must examine whether the expert has explained how he "applied his experience to the facts of the case." *Cook v. Erie Ins. Co.*, 478 F. Supp.

13

3d 658, 666 (S.D. Ohio 2020). An expert must "explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts." *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005).

Setcavage has much to say about the process of opening and investigating an insurance claim.[2] But with respect to the claim valuation, he does not explain what the industry standards are or what factors should be considered, especially for the pain and suffering component of a claim. He also fails to discuss his experience in assigning values to claims, and he fails to explain how his experience would apply to the facts of this case. Tellingly, Setcavage admitted in his deposition that he did not complete a valuation of Norman's claim. *See* Setcavage Dep. at 64. He conceded that his opinion (that the claim's value exceeded $100,000) was no more than an "initial impression." *Id.* In other words, Setcavage himself deviated from the standard which he and State Farm agrees exists – that a person evaluating a claim should be thorough and fair in their review of the evidence before assigning a value or range of values to the claim.

Setcavage's failure to be thorough is evident on the record. As noted, he relied on unsupported factual assumptions about Norman needing to be life-flighted and about the amount of the medical bills. Moreover, Setcavage does not demonstrate in his Report that he is familiar with the nature of Norman's injuries, treatment or post-treatment condition.[3] Instead, the Report simply cites the purported amount of the medical bills and a generalization that Norman needed "extended hospitalization." Doc. 33-9 at PAGEID 436. In his deposition, Setcavage testified that he did not know what the medical records said about Norman's pain levels or what treatment Norman may have received after being discharged from the nursing and rehabilitation facility. *See* Setcavage Dep. at 69–71, 77. Setcavage believed, based on his initial impression, that the accident had "ruined basically [Norman's] last years on this earth." *Id.* at 75. This belief is contradicted by the Sempireks' testimony. *See* N. Sempirek Dep. at 42–48 (testifying that his neck is fine other than an occasional

---

[2] Setcavage opined that State Farm deviated from industry standards by delaying in its initial investigation of Norman's claim and by paying the second Medicare lien of $11,258 without thoroughly investigating whether the lien was valid. However, plaintiff has not incorporated either of these alleged deviations into his bad faith claim. As to the delay in investigation, plaintiff acknowledges that his own conduct contributed to the delay. *See* Doc. 33 at PAGEID 129. As to the lien, State Farm's alleged deviation – paying the amount on Norman's behalf without first verifying the validity of the lien – caused no alleged harm to plaintiff.

[3] The Report's recitation of the "Facts of Occurrence" states that Norman was life-flighted to a hospital and later received rehabilitation at a nursing home. Doc. 33-9 at PAGEID 426. It contains no statements about Norman's injuries, treatment or condition.

14

clicking noise and that he takes pain medication to manage his lower back pain); V. Sempirek Dep. at 36–37 (testifying that Norman has backaches, but "[i]f he's not overdoing it, he's pretty good").

In sum, the Court finds that Setcavage's opinion as to the value of plaintiff's claim is so unreliable – lacking in a foundation and in a proper methodology grounded in experience – that his opinion must be excluded from consideration.

### 2. Opinions as to Motive and State of Mind

State Farm challenges other portions of Setcavage's Report and testimony. Setcavage accuses State Farm of trying to "take advantage" of the Sempireks. Doc. 33-9 at PAGEID 432, 436; *see also* Setcavage Dep. at 139. And he opines that the Sempireks were "unsophisticated" consumers who did not understand the claim process and were confused by the way State Farm handled the Medicare lien. Doc. 33-9 at PAGEID 436; Setcavage Dep. at 139

The intent and state of mind of a person is "not properly the subject of 'scientific, technical, or other specialized knowledge.'" *CMI–Trading v. Quantum Air*, 98 F.3d 887, 890 (6th Cir. 1996) (quoting Fed. R. Evid. 702). Here, State Farm's motive and the Sempireks' state of mind are not within the field of Setcavage's specialized knowledge. It is for him to opine whether State Farm deviated from industry standards and for the jury to decide the parties' motives and mental states. *See Waite, Schneider, Bayless & Chesley Co., L.P.A. v. Davis*, 253 F.Supp.3d 997, 1013 (S.D. Ohio 2015) ("'The jury is sufficiently capable of drawing its own inferences regarding intent, motive, or state of mind from the evidence, and permitting expert testimony on this subject would be merely substituting the expert's judgment for the jury's and would not be helpful to the jury.") (internal quotation marks omitted). Thus, the Court excludes from consideration Setcavage's opinions about State Farm's motives and the Sempireks' mental state.

Similarly, the Court excludes from consideration two additional statements which Setcavage made in his deposition about the Sempireks' mental state. When confronted with evidence indicating that Norman's injuries were not as severe as Setcavage may have assumed them to be, Setcavage responded by speculating that Norman is "not the type of guy to go and seek treatment" and by discrediting Veronica's positive assessment of Norman's recovery because she "had a tremendous amount of guilt" as the tortfeasor. Setcavage Dep. at 77, 125. Such opinions fall outside the scope of Setcavage's specialized knowledge.

### D. Cross-Motions for Summary Judgment

Plaintiff contends that State Farm acted in bad faith by paying $87,409 instead of the $100,000 policy limit. The key to plaintiff's theory was Setcavage's opinion about the value of the

15

claim. With the expert's opinion excluded from consideration, the Court finds that State Farm is entitled to summary judgment.

State Farm has established that it undertook a thorough and fair review of plaintiff's claim for UM coverage. State Farm repeatedly communicated with the Sempireks, sometimes receiving no response, in an effort to collect all available information about Norman's injuries, treatment, bills, and post-rehabilitation condition. *See* Doc. 33-4; Pfettscher Dep. at 40, 55–56, 60–65. Pfettscher waited to make a valuation until he was able to confirm with Veronica that Norman was no longer receiving treatment related to his accident and had reached a stable condition from which his pain and suffering claim could be reliably valuated. *See* Pfettscher Dep. at 45, 53. Plaintiff has not offered evidence from which a factfinder could reasonably conclude that State Farm engaged in bad faith in the course of investigating plaintiff's claim.

Further, plaintiff has not offered evidence showing that State Farm deviated from industry standards in performing the valuation of plaintiff's claim. Pfettscher explained that his valuation had three components: the Medicare lien, lost wages, and pain and suffering. The amounts of the first two components are not in dispute.

With respect to pain and suffering, Pfettscher explained the process by which he arrived at a value range. Following State Farm's policies, he considered liability, the type and severity of the injury, the type and length of treatment, the insured's age, his time off work, the "amount of recovery," any lingering effects, and the effect on the insured's daily living. *Id.* at 40, 55, 62–63. Pfettscher spoke directly with the Sempireks to gain a sense of their emotional state and to gather information about Norman's condition which might not have been reflected in the medical records. *See id.* at 63–64. Pfettscher then assigned a value range and submitted it to a supervisor, who increased the valuation range. *See id.* at 54–55; Doc. 33-4 at PAGEID 309.

Plaintiff has not identified how Pfettscher deviated from industry standards in performing the valuation. Further, Setcavage conceded that assigning a value range on pain and suffering is appropriate in cases where the valuation falls below the policy limits. Setcavage Dep. at 114.

Plaintiff simply disagrees with State Farm's determination of the value range. But it takes more than a disagreement over the result to establish bad faith – plaintiff must show that State Farm's assessment was so off-target as to not even be fairly debatable. *See Tokles*, 65 Ohio St.3d at 630, 605 N.E.2d at 943.

Plaintiff has not made such a showing. Plaintiff strenuously argues that State Farm's valuation breached its duty because State Farm failed to offer him what he was legally entitled to

16

receive under the policy. This argument wholly ignores the language of the policy. Yes, the policy provides that State Farm will pay the insured what he is "legally entitled to recover" from the tortfeasor. *See* Doc. 33-2 at PAGEID 170 (Insuring Agr., ¶ 1). However, the term "legally entitled" does not mean, as plaintiff seems to assume it does, that plaintiff should automatically receive the policy limit. Rather, the policy says that he is legally entitled to receive what he and State Farm *agree* to as the proper amount of compensatory damages. *See id.* (Deciding Fault and Amount, ¶ 1.a(2)). Short of an agreement, he is legally entitled to receive an amount which he can secure through a judgment in a lawsuit against the tortfeasor. *See id.* (Deciding Fault and Amount, ¶ 1.a(2)). In this situation where State Farm paid to plaintiff what he willingly agreed to – and therefore what the policy views as full and fair compensation – plaintiff has failed to show that State Farm's valuation is so incorrect as to be outside the zone of being fairly debatable.

Nor has plaintiff put forth evidence from which a jury could reasonably find that State Farm acted in a manner which was arbitrary or capricious, or demonstrated a dishonest purpose, conscious wrongdoing, or a motive or ill will in the nature of fraud. *See Spremulli's Am. Serv.*, 91 Ohio App.3d at 322, 632 N.E.2d at 601; *Hoskins*, 6 Ohio St. 3d at 276, 452 N.E.2d at 1320.

Plaintiff contends that State Farm took advantage of the Sempireks, who were elderly (in their 80s), unsophisticated and confused. The evidence does support an inference that the Sempireks were unsophisticated insurance consumers. *See* N. Sempirek Dep. at 53, 57–58 (testifying that he chose not to stay informed about the claims process and instead relied on Veronica); V. Sempirek Dep. at 18–19 (stating that she had no prior experience with automobile insurance claims). Even so, plaintiff must offer some evidence that State Farm acted in bad faith, such as taking or trying to take advantage of the Sempireks' lack of sophistication.

Plaintiff argues that it was evidence of bad faith for State Farm to have attempted to engage in negotiations with the Sempireks over the settlement amount. Again, this argument wrongly assumes that plaintiff was entitled to the policy limit, and it ignores the policy language, which called upon State Farm and the insured to attempt to agree to the amount of compensatory damages. *See* Pfettscher Dep. at 67 (stating that it is State Farm's practice to assign a range of fair values on every injury claim).

Plaintiff also faults State Farm for treating its own insured like an adversarial third-party in the bargaining process, but there is no evidence of State Farm treating the Sempireks in such a way. To the contrary, State Farm offered the Sempireks an initial amount within its fair value range, and Pfettscher, without needing to, voluntarily increased the settlement offer by $6,000 when he sensed

17

that Veronica would not be attempting to negotiate on her own behalf.  *See* Pfettscher Dep. at 73–74, 76.

The Court further finds no evidence from which a jury could conclude that State Farm pressured, coerced or deceived the Sempireks in the settlement process.  Once Pfettscher became aware that Norman was no longer receiving treatment for injuries, he explained to Veronica the choices for moving forward – for State Farm to wait to issue payment until it received the final Medicare lien, or to go ahead and issue payment based on an estimated lien amount.  Veronica wanted to go ahead with payment, telling Pfettscher to "get it over with."  Pfettscher Dep. at 45.  Pfettscher proceeded with the valuation and explained it in detail to Veronica.  He did not ask her to accept it on the spot, but instead gave her an opportunity to discuss it with Norman and call State Farm back when they were ready.  *See* Doc. 33-4 at PAGEID 308.  And even when Veronica called back to accept, Pfettscher refused to consider the offer accepted until he could speak with Norman directly, explain how State Farm calculated the offer, and get Norman's approval.  *See* Pfettscher Dep. at 65–66.

Plaintiff emphasizes that the Sempireks were confused over the Medicare lien situation.  The record supports this assertion, at least to some degree.  Veronica testified that she was uncertain as to how much the additional medical bills would be, beyond the known Medicare lien amount.  *See* V. Sempirek Dep. at 23; N. Sempirek Dep. at 57 (same).

The record does not support a finding that Pfettscher intended to confuse the Sempireks or that he knew that they were confused.  When Pfettscher first presented the options to Veronica in April 2020, he explained that he did not have a final Medicare lien amount at that time and possibly would not for many months.  He cautioned them that there indeed was uncertainty over how much the final lien amount would be.  *See* Pfettscher Dep. at 48–49.  He believed that the Sempireks understood that element on uncertainty.  *Id.*  Having received Veronica's decision to move forward, Pfettscher said that he would proceed in setting a claim value based on the known Medicare lien amount.  When he offered a settlement amount, he explained the numbers to both Veronica and Norman.  He advised Veronica to set aside a certain portion of the settlement to pay the known Medicare lien amount and represented that State Farm would review any additional medical bills for payment, up to the policy limit.  *See* Pfettscher Dep. at 46–49, 65–66, 83, 86, 89, 92, 96–97; Doc. 33-4 at PAGEID 307–308.

There is no evidence that the Sempireks expressed confusion or concern to Pfettscher or State Farm about the Medicare lien.  When the known Medicare lien amount of $16,763 was billed,

18

Pfettscher notified the Sempireks and gave them instructions for where to send payment. *See* Doc. 33-3 at PAGEID 206. When Veronica received the bill, she followed Pfettscher's instructions and successfully paid the bill. *See* V. Sempirek Dep. at 44–45.

Nor is there any evidence that the Sempireks were harmed by their confusion. Veronica was able to pay the Medicare lien of $16,763, and State Farm followed through on its promise that it would review and pay additional bills. State Farm promptly paid the additional lien amount of $11,258 and did so directly, without the Sempireks needing to be involved. In other words, there is no evidence that State Farm took advantage of the Sempireks' confusion to its benefit or their harm.

In sum, the Court finds that plaintiff has failed to produce evidence from which a jury could conclude that State Farm acted in bad faith or without reasonable justification in paying out $87,409 instead of the $100,000 policy limit to the Sempireks.

Because State Farm is entitled to summary judgment against plaintiff's claim of bad faith, plaintiff's claim for punitive damages fails as well. *See* Ohio Revised Code 2315.21(B)(1)(b).

## IV. Conclusion

For the reasons set forth above, defendant State Farm's motion to exclude certain opinions of plaintiff's expert Stuart Setcavage (doc. 40) is GRANTED; State Farm's motion for summary judgment (doc. 31) is GRANTED; and plaintiff's motion for summary judgment (doc. 32) is DENIED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: March 29, 2023